IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WILLIAM BUCK, R21689, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18-cv-2125-DWD |
| | ) | |
| SGT. RIGDON, *et al*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Before the Court is Plaintiff's Motion for Adverse-Inference Instruction (Doc. 237). Defendant Regelsperger filed her Response in Opposition (Doc. 249), as did Defendants Edwards, Gardiner, Holle, Mallory, Phelps, Purdom, Rigdon, and Weaver ("IDOC Defendants") (Doc. 251). For the reasons explained below, the Motion for Adverse-Inference Instruction is **DENIED**.

## BACKGROUND

Plaintiff William Buck, an inmate of the Illinois Department of Corrections (IDOC), currently incarcerated at Pontiac Correctional Center ("Pontiac"), brings this action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights while at Menard Correctional Center ("Menard"). The Complaint alleges the violations took place on June 16, 2017 around various locations at Menard (Doc. 2).[1] Plaintiff alleges that after the events at the West House giving rise to his excessive force and sexual assault claims,

---

[1] For the sake of clarity, Court will only discuss the facts relevant to the Motion for Adverse-Inference (Doc. 237) and Defendants' Responses (Docs. 149, 251).

1

and his denial of mental or medical care at the healthcare unit, Plaintiff was escorted to North 2 by Defendants Holle and Mallory, where he first went to the showers on 2 Gallery. Next, Plaintiff claims he was taken into a room with Defendants Phelps and Gardiner at internal affairs. Then Plaintiff alleges he was escorted, naked, in front of dangerous inmates from the shower room to a cell, where he remained for hours and did not receive medical treatment.

In his motion, Plaintiff alleges the existence of video footage which would corroborate his claims that occurred in the North 2 cell house: "(1) [his] physical condition as he was taken to the shower room there; (2) corrections officers threatening him while he was in the shower room; (3) [his] condition while he was being walked from the shower room to a cell on a different floor; (4) [his] condition when he was placed in the North 2 cell and then removed from there hours later; and (5) the absence of any medical treatment provided to [him] at the cell." (Doc. 237, pp. 1-2). Plaintiff contends that because medical notes made hours later at his intake at Pontiac Correctional Center stated that Buck had visible injuries, such as swelling and redness in his right eye, that the North 2 video footage would evidence the same visible injuries (Doc. 237, p. 3). However, according to Plaintiff, this video no longer exists because the Illinois Department of Corrections ("IDOC") allowed the video to be recorded over in the normal course of practice (Doc. 237, p. 2). According to Plaintiff, this is spoliation which entitles him to instruct the jury to draw an inference that had the video been preserved, it would have provided evidence of his claims (Doc. 237, p. 2). Defendants, however, claim that the evidence that Plaintiff

suggests would have been depicted is not relevant to the Plaintiff's surviving claims and, therefore, is inadmissible.

## ADMISSIBILITY

"All evidentiary questions begin with Rule 402, which contains the general principle that relevant evidence is admissible and irrelevant evidence is not." United States v. Gomez, 763 F.3d 845, 853 (7th Cir. 2014) (internal markings omitted). Evidence is relevant if it has any tendency to make a fact of consequence "more or less probable." Fed. R. Evid. 401.

IDOC Defendants contest Plaintiff's claim that the North 2 video evidence would reveal relevant information to his claims (Doc. 251). First, IDOC Defendants claim that the alleged video is irrelevant to the surviving claims in his case, which do not concern Plaintiff's claims that he was threatened or endangered while walking through the North 2 cell house naked and in front of dangerous inmates. IDOC Defendants also note that Plaintiff does not allege he was harmed after he left the health care unit. Furthermore, IDOC Defendants assert that the footage would not provide relevant evidence to his deliberate indifference claim against Defendants Phelps and Gardiner, where he only alleges that they interviewed him for "two to three minutes" at most, took photographs of him, and then walked him to a cell, but did not harm him during that time. Additionally, IDOC Defendants argue that North 2 security footage would be too grainy

to serve as "dispositive evidence" of Plaintiff's alleged blindness or broken bones (Doc. 251, p. 4).[2]

First, nowhere in Rule 401 is the requirement that evidence be "dispositive" to be relevant. Instead "relevance" under Rule 401 is a liberal standard. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S. Ct. 2786, 2795, 125 L. Ed. 2d 469 (1993) ("Rule [401]'s basic standard of relevance thus is a liberal one."). Plaintiff has stated that the alleged North 2 security footage is relevant to five facts of consequence: "(1) [his] physical condition as he was taken to the shower room there; (2) corrections officers threatening him while he was in the shower room; (3) [his] condition while he was being walked from the shower room to a cell on a different floor; (4) [his] condition when he was placed in the North 2 cell and then removed from there hours later; and (5) the absence of any medical treatment provided to [him] at the cell." (Doc. 237, pp. 1-2). While IDOC Defendants are likely correct that the footage's alleged depiction of non-party correctional officers threatening Plaintiff while in the shower footage is not relevant to Plaintiff's surviving claims, the other facts related to Plaintiff's physical condition and absence of medical treatment are relevant under Rule 401's liberal standards.

If Plaintiff's claims about the security footage are true, the video depicted Plaintiff's physical condition in the midst of the events at issue in this case. Such footage,

---

[2] To demonstrate the quality of footage at Menard during the time frame in question, IDOC Defendants offer to provide video footage of a separate incident that occurred in the yard. However, this footage is not from the same cameras nor from anywhere in North 2. IDOC Defendants do not state any similarities between the two recordings apart from the fact that both existed at Menard on the date in question (*e.g.*, similar lighting, distance, angle, kind of camera, etc.). Without more, the Court does not see how this other footage may bear on the issue of the quality of the alleged video at issue here.

if Plaintiff is to be believed, would tend to prove or disprove facts of consequence: whether Plaintiff incurred injuries from alleged excessive force after his restraint by Defendants during the altercation in the West House and whether those injuries would have been visible to Defendants Regelsperger, Phelps, and Gardiner, who Plaintiff alleges failed to provide adequate medical care despite his obvious injuries.

Finally, IDOC Defendants assert that the alleged video would be inadmissible at trial under Rule 403. Such footage, IDOC Defendants contend, of non-party officers threatening and escorting Plaintiff naked before dangerous inmates would "inflame and mislead the jury." (Doc. 251, pp. 4-5). IDOC Defendants argue that since Plaintiff will testify to his alleged condition while in North 2, which is already depicted in photographs taken during his interview with Defendants Phelps and Gardiner and upon his arrival at Pontiac, any probative value that would have been offered by the video footage is outweighed by the risk of unfair prejudice (Doc. 251, p. 5).

Under Federal Rule of Evidence 403, the Court has authority to exclude relevant evidence if its "probative value is substantially outweighed by a danger of ... unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Unfair prejudice is an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Thompson v. City of Chicago, 722 F.3d 963, 971 (7th Cir. 2013) (quoting Fed. R. Evid. 403 advisory committee's notes on 1972 Proposed Rules); *see also Old Chief v. United States,* 519 U.S. 172, 184–85, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). The more probative the evidence, the more the court will tolerate some risk of prejudice,

5

and vice versa. *See Thompson*, 772 F.3d at 971 (citing *United States v. Boros*, 668 F.3d 901, 909 (7th Cir. 2012); *see also United States v. Vargas*, 552 F.3d 550, 557 (7th Cir. 2008)). Notably, however, the Court's 403 analysis is limited here because the alleged North 2 footage no longer exists and what the video may have depicted is less than certain, as is weighing any probative or prejudicial value it may have possessed. However, as stated earlier, if the video contained the information regarding Plaintiff's physical condition and lack of medical care while in his cell in North 2, it could provide relevant information to *all* of his claims. Furthermore, the video may have been a source of very probative information in that it could have communicated information different than or additional to information contained in Plaintiff's testimony or the photographs of Plaintiff taken in North 2. In the end, it is impossible to say with precision what the video might have conveyed to the jury had the images not be destroyed.

However, in so far as Defendants argue that testimony regarding the circumstances surrounding the destruction of the video will confuse and mislead the trier of fact, the Court finds little reason to believe it is so unfairly prejudicial as to be inadmissible under Rule 403. While possibly true that evidence of the destruction of the video data will prejudice Defendants, "most relevant evidence is prejudicial, so the issue is whether it was *unfairly* prejudicial." *Whitehead v. Bond*, 680 F.3d 919, 933 (7th Cir. 2012). In this case, Defendants will have ample opportunity to explain that the lost video footage was destroyed pursuant to department policy. *See Pursell v. HydroChem, LLC*, No. 3:20-CV-01188-MAB, 2023 WL 2967274, *2 (S.D. Ill. Apr. 17, 2023) (reasoning that the testimony of lost records was relevant to explain why there was missing documentation, and

6

defendant would be given ample opportunity to explain why the documents were destroyed, such that the evidence was not inadmissible under Rule 403). Of course, whether the jury accepts such an explanation turns on Defendants' credibility, but the Court does not believe that mere discussion of the fact that the video was recorded over will cause such a strong emotional reaction in the jury as to render the trial unfair. Additionally, in the case that Plaintiff attempts to conflate the lost video with a claim, the Court is able to prohibit such testimony or provide cautionary or curative instructions.

Moreover, testimony regarding the lost footage is relevant to explain why there is no documentation of the events in North 2, when Plaintiff alleges there were security cameras in the front of the shower room, gallery 2, and gallery 4. The loss of the video is probative of the credibility of the witnesses in this case, as parties tell vastly different versions of the events of June 16, 2016, and the video may have provided insight into facts of consequence surrounding Plaintiff's alleged injuries and how Defendants treated him. C.*f. Schroeder v. City of Waukesha*, No. 13-CV-696-JPS, 2014 WL 1663531, *2 (E.D. Wis. Apr. 25, 2014) (reasoning that evidence of a lost video was not prejudicial where defendants would have the opportunity to explain how and why video was lost, such evidence was "highly probative of the credibility of the defendants' witnesses," and "the deletion of the video was relevant because it makes the defendants' position and witnesses all the less credible (and may actually make [the plaintiff's] version of events more believable."); *Whitehead*, 680 F.3d 919, 930–31 (7th Cir.2012) (finding evidence probative of officers' credibility and relevant under Rule 401 as it made one version of events more believable).

However, the Court cautions that it will not "permit a trial within a trial" regarding the lost video. *Pursell,* 2023 WL 2967274 at *2.

## SANCTIONS

The Court turns to Plaintiff's request for an adverse-inference instruction. "Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). Plaintiff states that a court may sanction the spoliation of evidence pursuant to "Federal Rule of Civil Procedure 37, this Court's inherent authority, or 'a combination of the two.'" It is unclear on which basis Plaintiff requests these sanctions. Generally, Rule 37 permits sanctions when the destruction of evidence violates a discovery order and represents willfulness, bad faith, or fault, while the Court's inherent authority permits spoliation sanctions only when there is a duty to preserve the evidence and its destruction represents bad faith. See *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, MDL No. 2385, 12-md-2385, 2013 WL 5377164, *5 (S.D. Ill. Sept. 25, 2023) (discussing Rule 37 and the Court's inherent authority as the primary sources for the imposition of sanctions for the failure to preserve evidence). In its motion, Plaintiff does not allege that Defendants violated a discovery order and cites law that aligns with sanctions under the Court's inherent authority. In light of these representations, the Court will only proceed in its analysis for sanctions under its inherent authority. See *Malibu Media, LLC v. Harrison*, No. 1:12-CV-01117-WTL, 2014 WL 7366624, *9 (S.D. Ind. Dec. 24, 2014), report and recommendation adopted in part, No. 1:12-CV-1117-WTL-MJD, 2015 WL 3545250 (S.D. Ind. June 8, 2015) (finding it would be "inappropriate" to proceed under a Rule 37 analysis where the plaintiff did not

identify a court order that the defendant disobeyed, and instead, "Plaintiff's motion apparently relie[d]…on the Court's 'inherent power to sanction parties for misconduct such as spoliation of evidence…'[,] [which] requires a showing of bad faith.").

The district courts' inherent authority to impose sanctions "emanates from the nature of the institution and the need to 'impose silence, respect, and decorum, in their presence, and submission to their lawful mandates…so as to achieve the orderly and expeditious disposition of cases.'" *Fuery v. City of Chicago*, 900 F.3d 450, 463 (7th Cir. 2018) (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)). "[W]hen a party intentionally destroys evidence in bad faith, the judge may instruct the jury to infer the evidence contained incriminatory content." *Bracey v. Grondin*, 712 F.3d 1012, 1019-20 (7th Cir. 2013) (citing *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633 (7th Cir. 2008)). In order for an adverse-inference instruction to be given, the movant must first establish both a duty to preserve and destruction in bad faith. *Lewis v. McLean*, 941 F.3d 886, 892 (7th Cir. 2019) (citing *Bracey*, 712 F.3d at 1019); *see also Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) ("[A] showing of [bad faith] is a prerequisite to imposing sanctions for the destruction of evidence.") (citing *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 721 (7th Cir. 2001); *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)); *see also Malibu Media, LLC*, 2014 WL 7366624 at *3. The focus is on the reason for the destruction of the evidence and not merely the fact that the evidence was destroyed. *Bracey,* 712 F.3d at 1019 (quoting *Park v. City of Chicago*, 297 F.3d 606 (7th Cir. 2002); (citing *Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422, 428 (7th Cir. 2010)). Accordingly, before an adverse-inference instruction may be given, Plaintiff must establish 1) IDOC had a duty

9

to preserve the North 2 video evidence because it knew or should have known that litigation was imminent, 2) that while under this duty, IDOC destroyed the evidence for the purpose of hiding adverse information, 3) the sanctionable conduct by IDOC ought to be imputed to Defendants.

### A. Duty to Preserve

A spoliation sanction is proper "only where a party has a duty to preserve [the] evidence because it knew, or should have known, that litigation was imminent." *Trask-Morton*, 534 F.3d at 681-82. Plaintiff alleges that IDOC knew or should have known that litigation was imminent, such that it had a duty to preserve the North 2 video footage before it was recorded over (Doc. 251, p. 6). Plaintiff cites a disciplinary report issued against him on June 19, 2017, stating that he was handcuffed and taken to North 2 on June 16 (Doc. 251, Exh. C, p. 2). Furthermore, Plaintiff notes that an incident report was filed June 30, 2017, that referred the altercation involving Defendant Purdom in the West Cell house to the State's attorney for prosecution and stated that Plaintiff was "taken to health care for treatment and also to North 2 after his treatment in HCU." (Doc. 251, Exh. D, p. 2). Finally, Plaintiff references his grievance report that was received by an officer on July 13, 2017 (Doc. 251, Exh. E, p. 2). Additionally, Plaintiff notes that Joshua Schoenbeck, IDOC's Rule 30(b)(6) witness, acknowledged in his deposition that IDOC would preserve evidence connected with events at issue in incident reports (Doc. 251, p. 6; Exh. A, pp. 12-14).

IDOC Defendants explain that the North 2 video cameras were on a "loop," such that footage was automatically stored on the DVR system, and the length of time footage

was stored depended on how much space was on the DVR, usually "up to a month" or "a couple weeks." (Doc. 251, p. 5). Unless the footage was specifically downloaded, IDOC Defendants claim the system would automatically record over it. (Doc. 251, pp. 5-6). IDOC Defendants contend that the footage was recorded over in this normal course of practice, and it did not receive notice of imminent litigation in time to preserve the footage (Doc. 251, pp. 6-7). IDOC Defendants argue that the June 19 disciplinary report did not indicate imminent litigation, as it was IDOC's policy for no video from North 2 to be reviewed when the only reference in a report was related to the standard practice for all correctional staff to "indicate individuals in custody are taken to health care unit and North 2, which serves as the restrictive housing area." (Doc. 251, p. 6). As to the incident report and referral to the State's attorney, IDOC Defendants claim that Defendant Purdom did not leave the West cell house after the altercation with Plaintiff, such that there was no indication of imminent litigation regarding the incidents in the North 2 cell house (Doc. 251, p. 6). Finally, IDOC Defendants claim that Plaintiff's grievance was received on July 13, 2017, only three days prior to the automatic "30-day loop," if the video had not already been recorded over (Doc. 251, pp. 6-7). IDOC Defendants state that the Pontiac Warden's office received Plaintiff's grievance directly for emergency review but deemed it non-emergent as the allegations concerned a past incident rather one posing a substantial, imminent risk, and so the Warden directed Plaintiff to resubmit the grievance in a normal manner (Doc. 251, p. 7). IDOC Defendants allege that the grievance was then deemed moot by the grievance counselor as the PREA

11

investigation was initiated on July 21, 2017, four days after the automatic "30-day loop" (Doc. 251, p. 7).

Courts have found no duty to preserve evidence prior to the date that a defendant received a demand letter or notice that a claim was filed. *See Trask-Morton*, 534 F.3d at 681-82. (finding the district court did not abuse its discretion in denying sanctions for the pre-litigation destruction of evidence because the defendant had no reason to suspect litigation, and thus no duty to preserve anything, until receiving the plaintiff's demand letter) (citing *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001)); *Norman-Nunnery*, 625 F.3d at 429-30 (finding the plaintiff was not entitled to an adverse inference instruction where the relevant documents were lost before the defendant knew or should have known litigation was imminent). There was no such demand letter filed here, so the question is when IDOC knew or should have known that litigation was imminent: with the disciplinary report on June 19, with the incident report on June 30, with the Warden's receipt of the grievance on July 13, or the PREA investigation on July 21. The Court is not inclined to believe that the disciplinary report or the incident report indicate that litigation was imminent, as they concerned his altercation with Defendant Purdom which began and ended in West House. Even though North 2 was mentioned, it was only to indicate that Plaintiff was taken to restricted housing after his restraint according to IDOC policy. IDOC had little reason to believe that the incident continued in North 2 until Plaintiff's grievance report reached the Pontiac Warden's office on July 13, which detailed his treatment in North 2. However, even if the Court decided that the duty to preserve

12

the tapes arose on July 13, no one knows the date when the North 2 footage was lost. Three days is such a narrow timeline that it would be difficult, if not impossible, to determine whether the footage was destroyed prior to the inception of IDOC's duty to preserve. *C.f. In re Pradaxa,* 2013 WL 5377164 at *9-14 (finding the duty to preserve did not arise until the defendants received a demand letter, approximately three months after the relevant documents were destroyed).

Even if IDOC had a duty to preserve the recording, Plaintiff still must demonstrate that the footage was destroyed for the purpose of hiding adverse information. *See Bracey,* 712 F.3d at 1019 ("Assuming—without deciding—that defendants had a duty to preserve the tapes, bad faith requires destruction for the purpose of hiding adverse information." (internal quotation marks omitted)). The Court will not decide whether a duty to preserve arose here because, as it will explain below, Plaintiff has failed to establish that IDOC destroyed the tapes in bad faith. Without bad faith, an adverse inference instruction is not warranted. *Id.*

### B. Bad Faith

"A party destroys a document in bad faith when it does so 'for the purpose of hiding adverse information.'" *Id.* (citing *Faas,* 532 F.3d at 644)); *see also Rummery v. Illinois Bell Tel. Co.,* 250 F.3d 553, 558 (7th Cir. 2001)). Absent bad faith, it is not enough to warrant an adverse inference instruction if a party had a duty to preserve evidence but intentionally or negligently destroyed it. *Bracey,* 712 F.3d at 1019-20; *accord Boutilier v. Menard Inc.,* 606 F. Supp. 3d 860, 865 (C.D. Ill. 2022).

13

In *Bracey*, the Seventh Circuit found no bad faith existed when footage was destroyed after a prison security official reviewed the prisoner-plaintiff's complaint where he never alleged that "any prison official actually viewed the relevant video (or deliberately avoided watching the video for fear of what it contained)." *Bracey*, 712 F.3d at 1019. The *Bracey* court reasoned that, "[w]ithout having seen the video, no prison official could have known the tapes potentially contained adverse information and, without that knowledge, could have destroyed the tapes for the purpose of hiding adverse information." *Id.* Furthermore, the Seventh Circuit recently upheld the Southern District of Illinois' decision to not impose an adverse inference instruction against prison officials for the destruction of a video recording allegedly depicting guards unlawfully attacking the Plaintiff, an Illinois prisoner, because the Plaintiff failed to provide any proof that the Defendants "[d]estroyed any video evidence, let alone intentionally" and "[w]ithout proof of [Defendants] personal involvement" in the destruction of the video, "no instruction was warranted." *Bentz v. Lindenberg*, 854 F. App'x 55, 57-58 (7th Cir. 2021) (citing *Bracey*, 712 F.3d 1018-19).

Here, Plaintiff alleges that no IDOC official ever reviewed the footage, and that it was automatically recorded over "in the normal course of practice" (Doc. 237, p. 2). Plaintiff credits that the footage was never reviewed in the first place due to IDOC's "head-in-the-sand" policy to determine an incident concluded after a prisoner was restrained, such that IDOC considered the June 16 incident "concluded" when Plaintiff was restrained at West House prior to ever arriving at North 2 (Doc. 237, p. 7). Plaintiff contends that this policy of not reviewing the footage was "designed to avoid information

14

for fear of what it contained." (Doc. 237, p. 7). Perhaps Plaintiff is right, and IDOC recorded over the video without reviewing it because it feared that it would incriminate Defendants, "but perhaps the explanation is benign." *Mathis*, 136 F.3d at 1155.

IDOC may have taken a "head-in-the-sand" approach, but that is not enough to establish bad faith. To paraphrase Occam's razor, "sometimes the simplest explanation is the best one." Schoenbeck offered a simple explanation in his deposition: IDOC had a policy to not review footage after an incident was deemed "concluded." In this case, IDOC viewed the incident over when Plaintiff was restrained in the West Cell house. The references to Plaintiff being taken to the healthcare unit and North 2 were due to standard procedures, and thus did not raise suspicion that Plaintiff was subject to further Constitutional violations. Plaintiff admits that the video was recorded over "in the normal course of practice" (Doc. 237, p. 2). Even if IDOC's policy of automatic recording over such footage was negligent or even grossly negligent, an adverse inference instruction requires a showing of bad faith. *See Bracey*, 712 F.3d at 1020 (finding the plaintiff was not entitled to an adverse inference instruction when nothing in his "filings show[ed] defendants destroyed the video because of any damaging content it may have contained."); *Park*, 297 F.3d at 615–16 (upholding the denial of an adverse inference instruction where records were destroyed under routine record expungement policy and there was no evidence of bad faith outside of plaintiff's own speculation); *Coates v. Johnson & Johnson*, 756 F.2d 524, 551 (7th Cir.1985) (affirming the denial of a spoliation sanction where "circumstances suggest[ed] that the documents were destroyed under routine procedures, not in bad faith").

Because Plaintiff has failed to demonstrate that IDOC or any Defendant destroyed evidence in a way that demonstrates bad faith, the Court will not sanction Defendants. Absent the imposition of a sanction in the form of giving an adverse inference instruction, it is unnecessary to discuss whether IDOC's failure to preserve the video ought to be imputed to Defendants. The destruction of the footage, however, may yet be relevant at trial. "Hence, although the Court will not sanction Defendant[s] for destroying the [North 2 footage], the Court also will not bar the introduction of evidence at trial concerning the circumstances of that destruction." See *Malibu Media*, 2014 WL 7366624 at *10.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Adverse Inference Instruction (Doc. 237) is **DENIED**.

**SO ORDERED.**

Dated: June 17, 2024

/s *David W. Dugan*

DAVID W. DUGAN
United States District Judge